Okay, our second argument of the day is in appeal number 24-1811, Grand Trunk Corporation v. STB, the Surface Transportation Board. Okay, I see Mr. Atkins, yep, we got it right. All right, Mr. Atkins, nice to see you, you can begin when you're ready. May it please the Court, legislatively mandated standards, those were your words used in the central state's decision to describe the compelling need test as a required showing for a forced reciprocal switch. That issue was not ancillary to that case or decided under the Chevron doctrine but was squarely raised and presented and decided by this Court as the proper interpretation of the statute, legislatively mandated standard. And that standard rests on an understanding that something substantial is being deprived from the railroads. The railroads don't just operate the first mile and last mile in terminal areas, they operate 1,000 miles in between, and they use terminal areas to build density, to build volume on those main lines so that they can earn a reasonable return on the large fixed cost of those investments. What a reciprocal switch does, or forced terminal access, is it requires the railroad to agree to hand that traffic over to a competitor for the long haul. Or in other words, it requires them to build densities on the competitor's network rather than their own. That's a big deal in the railroad industry, and that's why the ICC, dating all the way back into the 1920s, has said that it's not going to be in the public interest to deprive a railroad of its right to prioritize densities on its own network without a showing by the shipper, a compelling showing of need in the form of inadequate service. So the way I understand your argument, Mr. Atkins, is the shipper needs to show how it affects their business before there's a compelling need.  And this rule is flatly inconsistent with that legislatively mandated standard. So let me, the board has said it doesn't require any existing service problem. The performance metrics themselves, they've said, I have no bearing on inadequate service. You don't have to have a showing that the switch is actually going to help. There's no showing required that the switch is going to improve service. The switch could remain in place for three to five years. That's just based on the test that the rule sets forth. In other words, once the, if they don't meet the, if the carrier does not meet the performance metrics, the question in whether to issue a reciprocal switching agreement is simply do they have a good excuse for doing so? It has no reflection on, now I guess the shipper first has to negotiate with the carrier, right? And then the shipper has to ask for the reciprocal service agreement or switching agreement. But the shipper at no point has to demonstrate or establish that it affects their business in any way. Therefore, compelling need is not required under this rule if we were to uphold the rule. Yeah, that's correct. Yeah, I mean, that's a, we'll see what the government has to say about that. But can I go back to the, I want to make sure that I get the, I understand the links in the chain of what you're saying. What you're saying is that the stat, the statutory standard, we, based upon what we said in central states incorporates, you know, the ICC precedent, if you will. Going back to Jamestown and some of those other cases. And so the current statutory language requires a showing of actual necessity or a compelling need. And what you're saying is those are kind of terms of art, if you will. They have an established meaning within the regulatory sphere and their established meaning is that there has to be a showing of inadequate service. Is that correct? The best place for you to go for confirmation, so you don't just listen to me, the best source is the Interstate Commerce Commission and those two primary sources, the mid-tech decision in 1985. The ICC said unequivocally that the test is required and it requires a showing of inadequate service. And that's one ICC second, 362, 1985. How do you, how do you or your clients, how do you define or give some content to what constitutes inadequate service? So yeah, that's a kind of separate and apart from, I know the points you made about the rule, I get. That's the dialogue with Judge Kirsch. I get that. Right. So, you know. How do you know? It, I mean, I'm saying that if the, that's not, that's not a super clear answer, but if they're not providing service, they're missing switches. They're just unable to actually provide the service requirements that the customer needs. The customer says, you know, I'm in need of chlorine and we need this chlorine in order to provide clean water to the County of Los Angeles. If they're just not capable of providing what they need, that might be deemed sufficient inadequate service or compelling need to justify forcing the carrier to let another railroad bring in the chlorine to that particular destination.  My understanding though, is that, that, that, okay, and this helps because I think that may be a quite complicated question, but it's not a question that this appeal requires us to resolve. Correct. Absolutely does not because the board abandoned the compelling need test unequivocally in its rule. And so the, the central issue for us, no pun intended, is whether or not that the central state's decision is controlling. And we think it is. Um, we, we, we, oh, yes, Your Honor, you can go and finish. So I was just going to say that the railroads submitted lots of ways for the agency to conform the rule back to the compelling need test, but they were all rejected by the agency for the same reason is that it concluded that this was not a required showing on under the compelling interest prong of the, of the respective jurors. Judge Lee. So, um, in Delaware and Hudson, right, the 1983 ICC case, um, the commission starts by saying that to determine what's in the public interest, we have to determine the interests of the particular shippers and the interest of the carriers and the general public. So broadly a balancing test, we would say, balancing of interests. And then it goes on to define what the commission means by some actual necessity or compelling reason. And it defines that to be more than a mere desire on the part of shippers or other interest parties for something that would be convenient or desirable to them. Okay. Yeah. And so in the balancing of interests, right, uh, wouldn't the agency consider, uh, whether or not the, uh, what the shipper is requesting actually is going to help them materially in some way, actually benefit them, like what impact it would have on their business. Uh, doesn't that all kind of, that all go into the balancing test, melting pot of sorts for the agency to look at. So in other words, I'm saying that, you know, if, if, if a shipper says, you know what, I would love to have a train available 24 seven outside, you know, on my rail, right. So, uh, I'm, I'm going to request one of these and the commission then would just kind of look at that and balance everyone's interest and balance the cost to the incumbent railroad balance kind of, you know, the, what sort of benefit that would have to the shipper. And it would just consider all of those costs and benefits on both sides as part of that analysis. So I guess my whole point is, isn't the compelling reason kind of test basically a subset or a component or a factor that the agency has to consider in the overall balancing test? So, um, not, not, not precisely. I, what the, what I would say is the compelling need test is a prerequisite. You look at the statute though, it says that the authority is discretionary. So it doesn't say you shall do it when it says you may. And lots of courts have looked at this on the, on the, more importantly, the ICC has in and now when they're, if once you've made the showing of compelling need, which is, which requires a showing of inadequate service, now you start to take into consideration. Well, it can, it requires something more than just a desire, right? Of the shipper. But the mid tech decision says unequivocally there must be a showing of inadequate service. The briefing to this court in the central states decision says it's a prerequisite showing of inadequate sewing. So you're right. Go all the way back to Jamestown. They say something more than, but if you read the Jamestown decision, it also then goes on and says, given that we're taking something substantial away from the railroad absence, they say something like the service has not been shown to be so inadequate as to justify that form of relief. So inadequacy of service, your honors is a prerequisite. Now it's not the only thing that the board can consider because it's discretionary authority, right? It says you may, so they can consider the revenue needs or other factors of the operational complexities, other factors that might influence their decision, whether they're going to exercise the authority that was given to them by Congress. But according to this court central states decision, that required showing of a compelling need is the legislatively mandated standard and the board abandoned it when it adopted this rule. So if you agree with us, then we really don't need to talk too much about the arbitrary nature of the performance standards themselves. But if I could just take a moment to address one of them, that is a real disaster, which is the original ETA performance metric. This is the one that they said at 70%. They did it. They said when you all there, there's a lot of jargon here, so forgive me. Is that the one where they considered early drops? Yes. Okay. As, as early as, as being late is the, is what the, is how they changed the rule, which is that this is where the apples oranges argument comes in. Yes. Okay. I got it. Got it. Okay.  So, um, originally the, the, the board based this on some reports that the railroads provided to the, to the industry about their original on time performance, which was showing the industry around 80%. And so the board set the performance metric at 70% thinking that was conservative. Problem is they changed the definition on time performance and now early is late. And we, the railroads had told them, you have to be careful if you're going to change the actual definition of the metric. You can't rely on our prior reporting in setting that metric and the board disregarded that. And now there's publicly available information that shows you that the railroads have been reporting since September, a 50% original on time performance on average, it's plummeted down below the 70% metrics demonstrating that this apples and oranges problem is a really serious problem. Did the agency explain, I understand why they did that the early, okay, it makes intuitive sense, but that's not what's intuitive sentences in order for credit of the law. Do we know why when they, when they, when they added the early, um, on time arrival or OET, whatever they were saying, uh, when they added the, or they increased the threshold from 60 to 70%. Do we know why? Oh, uh, well they say that they thought set 60 wasn't sufficient to incentive properly incentivize the railroads. And I think I believe it's because they saw 80% as what the railroads were targeting. And in some cases achieving. So they wanted to, you know, create, but they're not, what I'm asking, I guess, is they're not correlated. It's not when they said, we're going to add the, they're going to add the early time arrivals and they can't manipulate the late time, right? That's so nothing to do with one or not, no, the 60 to 70 doesn't have anything to do with the second, the second decision. Um, the last issue I'd like to just touch on quickly is the, the requirement that we submit information to, uh, shippers upon their request. Again, this is not something you need to address if you vacate the whole rule, but I would encourage you to consider doing so because while they can on remand, they can fix the rule by conforming it to the compelling need test. This feature of their rule is on, cannot be rehabilitated if we are correct and it is likely to repeat itself. So I just like to take a couple minutes to run you through our theory of that and answer any questions. I just want to make sure I understand what you're saying. You're, what you're saying is even if you agree with us, even if the court agrees with you on the first point, we'd still like you to address the question of the sort of their authority to compel. Okay. Can you go over the why again? Because it's likely to repeat itself on remand, your honor. It's, it's, they, they can fix the problems with this rule on remand by conforming it to the compelling need test. Yeah. But if they don't have the authority to this, then, then they're just likely to repeat themselves and we'd be back here however many years. So the, can I, just in the interest of time, can I tell you the difficulty I have with your reporting argument is it seems to me that if a, that if a shipper were to say, we are considering petitioning the board for reciprocal changing authority, but it would sure help to have some information. Would you supply to us the information that has been given to you by carrier X, Y or Z? Okay. If, if that would be lawful for the board to disclose, in other words, it would not be a breach of an agreement, a breach of a regulation or statute or anything. I don't see why you couldn't do in one steps that one step, that which would be lawful in two. Okay. So let, let me, let me, let me address that question and then our fallback is in terms of right. Look, it may not be a good question and if it's not, you know, I think it is a good question, but let me just note that like, you know, there's a saying that the, you know, you have to walk in squares, you know, in square lines where if Congress gave them a certain authority, they have to comport with that authority. They can't sort of cut across the middle and say, we just think it'd be easier to do to give it directly. So we're not going to comply with the requirements of collecting the information ourselves and then the requirements for disclosure because there are your honor protections that lots of industries get when they give information to the, to, to the government. Yeah. They have a little bit of latitude though. Don't they enter like American trucking, a little bit of flexibility. Well, that's that American trucking does give them flexibility to find ancillary powers. No question, your honor, but it requires that it be necessary and that it'd be directly adjunct and this is really not directly adjunct to their own reporting requirements. If it were, it's kind of breathtaking how much data they could force the railroads to turn over to anyone because the railroads need, the STV needs tons of information to, to do its, to do its functions, to monitor the financial health of the railroad industry. If they actually have ancillary authority to require any of that information to be handed directly to any Tom, Dick and Harry that has a good faith reason to want to see it. That's a pretty expansive view of their ancillary authority, but I also, but let me say that it requires two, two prongs, your honor, and the last one is it has to be necessary. Right? So the Supreme court has said, not only does it have to be directly adjunct, it has to be necessary and it's not remotely unusual for, I see my time's expired. Go ahead. Go ahead. I'm trying to answer the question. Uh, I, it's not remotely unusual for a defendant to have the information that a plaintiff needs to bring their case. Can I ask you one more? Um, so this is helpful because I thought what you might be saying is similar to this in the sense that you might say we're worried, we're worried about abuse, abusive requests, harassing requests, the time that it would take to deal with all of this. Okay. But if Tom, Dick or Harry shows up to one of your clients and says, I would like that you would, can't you take the position that it's not good faith, that it's not good faith. Okay. If a competitor, if somebody else shows up and it does seem to be a good faith request, couldn't your client reasonably take the position? We will supply it to you. Okay. We, um, but we need a nondisclosure agreement. We need a confidentiality agreement. That's exactly what the railroads would normally do. Just to be a candidate, the railroads, they're not like at war with their customers. If a customer comes to them and says, I'm not satisfied with my service. Can we talk about a certain year of performance? And they ask for these metrics, the high likelihood is the railroads are going to voluntarily turn it over and they, they might ask for a nondisclosure, right? I think it's ordinary course, right? A simple protection. That's not what this rule requires. This rule would mandate the rule. They would be required by law to turn over with no, no possibility of a protective order, no nondisclosure agreement. Are you sure that's the way it would be implemented though? Yes, Your Honor. It's there's, there's nothing in the regulation that suggests there's no proceeding to get a protective order. Um, it just says you shall provide the information to them upon, upon their good faith request. And our position is, is that exceeds their authority and, and under the, the statute of ancillary, uh, authority, which is, you know, it's, it's a, it's a, it's a bit quirky, but the Supreme Court has said it needs to be narrowly tailored. It has to be necessary. Why is it necessary for pre-complaint discovery and it has to be directly ancillary to their authority. I see. Oh, yes, Your Honor. Can I ask, can I ask you a question about going back to the compelling needs test, uh, and central states, um, the, when basically it, the court in central states, uh, as part of its reasoning says, uh, rejects the, um, rejects the petitioner's view in that case that the admin, that the commission applied a different, a different test before the staggers act and after the staggers act. Right. And the court said the commissioner did not, the commission applied the same test. And then among the cases it cites are cases where the commissioner does not refer to a compelling need or have a finding of compelling need. Rather it just does a balancing test, a balancing of interest test. So, um, can you tell me how, and the government makes much of this and says, look, you know, that indicates that the compelling, uh, needs test is at most kind of a variation or, you know, uh, a way in which we're supposed to balance things in particular situations, but not the general rule. Uh, what is your response to that argument? So I'm, I'm gonna, I'm gonna come back to the same case that I referenced earlier and I'm gonna, which is the mid tech case, 1985 about where, again, the best source for the boards test and what, and what it was in 1980 when, when Congress basically, you know, moved some dirt from subsection a to subsection C is the ICC. And in the mid tech case, they write that if the affirmative finding of joint terminal use in the public interest requires a showing quote of some actual necessity or compelling reason, and then they go on to say a corollary of this requirement is that it must be shown that the existing service is adequate and they're citing all of their prior authority. So if you're going to be deferring your honors to anyone's understanding of what their authority was, it should be the ICC, which I'll note is what you did in central states because in one of your footnotes, you went through all of their cases and looked at them all and said from this, we agree. It is clear that the compelling need test was the established test as of 1980 when Congress put this, this power in place and, and the, the last, oh, I see you have a question, your question. No, I guess my, my followup is, uh, I, I still haven't heard the answer to my question, which is why would, if the court in central states was saying as you've, um, that the legislative legislative mandated compelling needs test, why in support of its position, would it cite cases where the ICC doesn't do a compelling needs analysis and does a balancing test? So I think that their reason would be, as you look at the briefs, what the, what the, the ICC said to the court was, if you look at all of these cases, they are all applying a compelling need test. They said, they said there might be a few of them where they didn't actually use the terms, but if that is the, that is the, how they, the synthesis of all of that precedent going back a hundred years was that there was a required showing of the compelling need test. And, and, and that is why you cited those cases because they create the foundation of this compelling need test. And it was later confirmed by MidTech two years after your decision that the compelling need test is required and requires a showing of inadequate service. I get sense. I didn't quite answer your question. You're on it, but I gave it, I gave it. No, I appreciate that. We'll give you some rebuttal time. How's that? Thank you. All right. Ms. Wilson. Nice to see you. Good morning. Your honors. May it please the court. Laura Wilson on behalf of the surface transportation board and the United States. A unanimous board adopted these regulations to address a critical national interest. These regulations grow out of the board's undisputed findings that for more than 10 years, there have been substantial and recurring deficiencies in the quality of rail service in the United States. The board's efforts to address that problem here are not a revolution, but an evolution, a considered evolution in the board's existing regulations on inadequate service. Those regulations have not been as effective as hoped in addressing the problem at hand. Therefore, the board designed these regulations to provide greater utility through greater predictability and greater efficiency in regulatory process, while at the same time, ensuring fair outcomes and that there would be no undue impairment to legitimate interests, such as revenue adequacy or rail operations. These regulations fall squarely within the statutory design. Under the statute, the board may prescribe reciprocal switching agreements when it, the board finds that those agreements are practicable and in the public interest. That structure gives the agency broad discretion. That discretion is guided by the rail transportation policy, which favor adequate service, that service that meets the public demand, but that also emphasizes competition as a way to achieve that goal of adequate service. Ms. Wilson, can I pause you while you're in this portion of your argument? Is your position under that statutory standard that a reciprocal switching agreement could be prescribed by the board absent a showing of inadequate service by a railroad? What the petitioning railroads mean by a showing of inadequate service, as they argued to the board that would require a showing of the level of harm to the shipper's business needs, whether the service to that petitioning shipper was worse than service to others, whether the business impact, the business losses to that customer were more dramatic than losses to other customers, and whether the alternate railroad could do a better job. Okay. I understand that part, that that was their argument, but the question for you is what is the board's position? Could the board, tomorrow, applying this, could it prescribe a reciprocal switching agreement without ever finding that there was inadequate service, and let's set aside what that, exactly what that means. Could you do that? The board has found here that this design addresses the problem of inadequate service. There is unquestionably a problem with the adequacy of the service. Okay, this is what, this is where there's a real mystery in this for me, okay, and please help me with this, because when I look at the final rule, I'm sorry, the regulation, and I see the statement by the board that the performance standards, the three of them, do not define what constitutes adequate rail service, you know, quote, unquote. So, I think to myself, hold on a minute here, I really don't understand this at all, because you would think performance standards are all about measuring performance. The board made clear, as a preliminary matter, that these regulations don't establish performance requirements, they don't establish what would apply under the common carrier obligation, for example. They are used only for this regulatory framework, which introduces competition, and I think that is the key to understanding these regulations, and also why the petitioning railroads keep referring to things that happened 100 years ago. But the reason that you would inject competition, it seems to me, if any of the history makes sense, you would inject competition to incentivize an incumbent rail carrier to improve its performance, and then when you look at this regulation, you say, oh, I understand how they're going to assess performance. There's three performance metrics, one of which, you know, Mr. Atkins was focusing on, but then you come to this express statement in the regulation that the performance, I'm literally reading from it, quote, unquote, the performance standards do not define what constitutes adequate rail service. I don't know, I can't make coherent sense out of this. The board's reasoning there is that the railroads don't have to do anything, even once this reciprocal switching agreement is prescribed. Once that agreement is in place, it's up to the commercial decisions of the two railroads and the shipper. If the incumbent railroad, what we call the railroad on whose lines the shipper's located, if that railroad doesn't think the other railroad can do any better, they don't need to change their service. So it becomes, that is the process through which the adequacy of the service, the level, the appropriate level of service is achieved. But Ms. Wilson, what I hear you saying is that the transportation, that the board can impose a reciprocal switching agreement, irregardless of whether the shipper's business or whether it has any effect on the business of the shipper whatsoever. So in other words, based upon what Judge Scudder read and based upon what you're saying, what I hear you saying is that the shipper doesn't matter here. In other words, the board has put forward these performance metrics that the railroads are expected to meet. If they don't meet them, a carrier can ask for a reciprocal switching agreement, and unless the railroad has a good excuse for not meeting these performance metrics, then the carrier will get a reciprocal switching agreement, irregardless of whether these performance metrics had any impact on their business whatsoever. Is that right? To be clear, these regulations only enable a shipper to apply for an agreement, not a competing railroad. So the shipper is necessarily involved and presumably will have decided that its level of service is not satisfactory to meet its business needs. Or it can just save money if it gets a reciprocal switching agreement. And how is that in the public interest? I mean, even based on your test, my next question is, if that's the test that the board is applying, how is that in the public interest, even if we get rid of the compelling need? On the abstract level, there is a relationship theoretically between cost and quality of  service, but again, these regulations rest on the board's observations based on substantial evidence that customers, shippers, they need better service. The complaint has not been, we need a better price for this low level of service. The complaint has been, we need better service to operate our businesses on an economic basis. But here's the difficulty with this for me. I don't think we have a debate before us about, can the board exercise authority in the realm of reciprocal switch agreements as a statutory matter, as a constitutional matter? I don't hear them arguing that. There's no, they can't even, you can't even operate in this space as a regulatory matter. I think what they're doing is they're saying, we have a final rule in front of us, and the agency has done something, and it's that something that we have a problem with. And when I look at the way that this operates, the board in different places kind of summarizes it as a five-part test, basically five, you know, where they're at step three, for example, there's an affirmative defense showing, you know what I'm talking about? Yes.  And then there's a couple of areas where there's operational feasibility that needs to be examined. An affirmative defense, it seems to me, would be, doesn't bear upon inadequate service, other than it would explain, it would give a carrier a chance to explain why service may have been inadequate. The operational feasibility tests are all forward-looking. And so, when I look at this, I still come back to this, I don't understand at all how this scheme works to ensure that there's been some showing of a service deficiency, because the board itself, again, says, don't look to the three performance measures for that. I don't even know what that means. Our concern with requiring elaborate showings as part of the case-by-case analysis is that that's essentially what's required under the existing regulations, and they haven't been effective. And so, let me, sorry, Your Honor, but let me also say that that framework— So that's what you're talking about is why did the board regulate? I get it. I get it. Maybe there's a need to regulate. But what I'm trying to do, all we are is a court of review, so I'm sitting here looking at how you regulated and trying to make sense out of it. And I think the key is competition. Competition is not merely a convenience to a private petitioner. Competition is what drives the railroad's investment decisions, their operating decisions, and it's that competitive pressure that the board believes is created by this regulatory framework that should incentivize better service on behalf of customers nationwide on a system-wide basis. Sorry. Ms. Wilson, as part of the agency's consideration of a petition for one of these arrangements, would the agency consider whether or not the request will fulfill a need of the shipper? Is that something that the agency would consider in its balancing test, or is that not included in the balancing test? The board did not limit what it would consider under the rubric of an affirmative defense. So I guess, you know, just hypothetically speaking, think of a case where a shipper just wants something out of convenience, right? And so it goes through the process. And I take it then the incumbent carrier can raise that as an issue during these proceedings and say, look, you know, the shipper doesn't really need this as a business need. They just want it because they just think, you know, it's a desire of theirs. First of all, is that something that a carrier, the incumbent carrier, can do? And second of all, is that a factor that the agency can or will consider? The board did not limit what could be argued as an affirmative defense. So yes, the railroad could argue they don't need it. This board decided not to specifically require that for the reasons we've discussed, but it could be raised. And I think another key to this framework is that all of these standards, all this process does is institute a new process on a case-by-case basis for when a new board will decide whether to issue a prescription or not. And at that time, the board would decide whether that is in the public interest as required by the statute, and that would be subject to review by the court at that time. And I take it that as part of the balancing test, for example, the greater the burden upon the incumbent carrier, presumably the greater the need would have to be kind of in broad strokes. The regulations provide for consideration of undue impairment to the ability to serve other customers. The board found here that when we're dealing with these specific cases and a limited term, three years perhaps for the prescription, the likelihood of there being this impairment to revenues is very low. So if I could, before we get too far afield, Petitioning Railroad's counsel started out with the premise that the railroads somehow have a vested interest in the business that originates on their line. But the reason he's referring to cases from the 1920s to support that is that there were certainly policies in place prior to the Staggers Act of 1980 that might have favored that approach. If you see Spokane, the 1978 case, two years before the Staggers Act, where number one, they disavow compelling needs standard, but two, they discussed then the policy approaches that were changing, and footnote 20 in that case emphasizes the importance of competition and the importance of the public interest that overrides just this presumed interest on the part of the railroads. They cite no statute, no regulation, no case law that clearly establishes that right that they're claiming. If I could also address central states, which we believe that this regulatory framework is fully compatible with central states. The court there recognized Congress intended, it authorized the board to prescribe reciprocal switching precisely as a means to promote adequate service through the threat of rail-to-rail competition. The problem for the petitioner in central states was that the case had nothing to do with competition or adequate service. There, the petitioner sought a mere convenience for its unrelated business purposes. Certainly it made sense in that context where there was no public interest at stake to forgo federal regulatory intervention. The fact-limited nature of that case is demonstrated by the Delaware and Hudson case, where the commission gives lip service to the compelling needs standard, but finds that there's a compelling need simply based on the potential benefits of competition, which would in fact have been introduced there. So this framework here under these regulations follows Delaware and Hudson, that framework that the commission set out there. Can I ask you a question about deference? So assume that we disagree with you and say we conclude that the compelling needs test as articulated by the petitioners was in fact the test that the agency used in the past. The agency in this rulemaking seems to either modify, and I know that's not the agency's position, but from the premise that I stated, then the agency's rulemaking would either modify or disavow that test or perhaps, as you would say, clarify that test. If we believe that the agency is modifying the test that traditionally used, what deference if any should we give the agency currently, given if we believe it changed its position? Two things. Supreme Court precedent makes clear that agencies can change their approach, and that there's no heightened scrutiny in that context. It's simply that the agency needs to explain the basis for its change in position. Here the board has, I believe, more than adequately explained the reasons for this approach. The fact that it's not working, the fact that it's really taking advantage of the competitive framework that Congress had in mind in 1980. I would also add that I would say it would be premature to conclude that results under this framework can't comply with even the compelling needs standard, that that question is perhaps best addressed in the context of a specific case when the court, the board and the court would have before it specific facts. Can you offer a brief response to the points Mr. Atkins is making, raising concerns about disclosures? First, we strongly disagree that there's been any delegation of authority to a private party. The regulation, the requirement here simply applies to the railroad as the regulated entity, asking that railroad to provide information that is part and parcel of implementation of these regulations. What about the circumstances? I think what he's in part worried, correct me if I'm wrong, but they're in part worried about requests that aren't advanced in good faith. They're worried about, they may want confidentiality or non-disclosure arrangements, which would be very ordinary course for proprietary commercial information. Right, and there is nothing in this rule that precludes the railroad from, number one, coming to the board and saying, we don't think that's a good faith request, we think we're being harassed. The board isn't going to presume harassment, but they would have the opportunity to come to the board on that. But on confidentiality, before the board, the railroads argued very limited confidentiality argument about the shipper versus the payor, which are not always the same entity. But it seems also plausible to me that the railroad could say, okay, customer, here's your information subject to confidentiality. As counsel said, that is part and parcel of their normal business course. So that's not foreclosed under these regulations. Okay, I'm hearing no further questions. Many thanks to you. Thank you, Your Honor. You're welcome. So I'll be quick. You asked the government, would they prescribe without a showing of inadequate service? Their brief at 17 is the clearest statement of that. The prescription under part 1145 would not be premised on a demonstration of a current ongoing service deficiency, period. So the answer to that is yes, they're not going to require a showing of inadequate service. I'm sorry, I guess I'm not familiar with the whole regulatory framework of the railroads, because I understand that there's a lot there. If the agency were to make a finding of inadequate service, would that trigger additional regulatory obligations or inquiries beyond kind of what we're looking at here? In other words, is a finding of inadequate service a term of art that the agency is trying to avoid? It might be a term of art that they're trying to avoid. It does have other implications. There's a long history about what is an adequate service in the rail industry. Are they satisfying their common care obligation, providing reasonable service upon reasonable request? But it's not a defined term of art. It's not like it says if you're giving five days a week, five switches a week, and you drop to four, that's inadequate service. Or if you're on-time performance is it. I guess what I'm saying is that if the agency were to say that there's to be a finding of inadequate service, would that then drag in all of the other case law that you're talking about, about all the various other things you need to look at beyond these three criteria measures? I don't think so. I'm not aware of anything that they were trying to duck, Your Honor. What they were trying to duck is the showing of inadequate service. But my last minutes, I really want to come back to one point you're making, because it's really fundamental. I absolutely take issue with the idea from the government that we can show need as an affirmative defense. The affirmative defense is they rejected our claim throughout the whole proceeding that a showing of compelling need is required before you do a switch. And the rules don't. There's no balancing test in it. They will apply a switch if these three performance metrics are not hit, full stop. And so the idea that we can go in and make an argument in a particular adjudication, raising a claim that they rejected in a notice and comment rulemaking, it's going to fall flat at the agency, because they're bound by the rules. And I'll give you one really good example. The one example the railroads were really adamant about is, what if we've cured the problem? What if this performance metric was triggered two years ago in the statute of limitations, and it's unequivocal that since that period of time, we've cured the problem? Shouldn't that be an affirmative defense? The court said no. And so I don't see how they can stand up here. I know that they have this other category of exemptions, but they can't simultaneously say in their decision that they're going to abandon the compelling need test and then tell this court that they will consider the issue of compelling need in their rule. The one reaction I had to the prior dialogue was that it also seems at odds with just the text of the affirmative defense section. Absolutely, Your Honor. In fact, the affirmative defense section is all about an incumbent rail carrier identifying some reason for why they failed to meet one or more of the performance standards, weather, floods, whatever. And they're really restrictive. If you want one further indication, look at the recommendation from Norfolk Southern in their comments, which said you should tie the affirmative defense to the compelling needs test. You should say you can submit any information that would show there was no compelling need and that was not accepted by the court. So with that, I would suggest that they are inconsistent with central states, fundamentally inconsistent with the compelling need test, and the rule should be vacated. Okay. Mr. Atkins, thanks to you and your colleagues. Again, Ms. Wilson, thanks to you. We appreciate the advocacy very much, and we'll take the appeal under advisement.